NO OILPORT!, A Non-Profit Corporation Licensed by the State of Washington; Norma Turner, President; Save the Resources Committee; National Audubon Society; Olympic Peninsula Audubon Society; Admiralty Audubon Society; Citizens' Pipeline Task Force; Northern Tier Information Committee; and Friends of the Earth, Plaintiffs,

v.

James Earl CARTER, President of the United States; Cecil D. Andrus, Secretary of the Interior; Frank Gregg, Director of the Bureau of Land Management; United States of America; and Northern Tier Pipeline Company, Defendants.

The LOWER ELWHA BAND OF KLALLAM INDIANS; the Port Gamble Band of Klallam Indians; the Skokomish Indian Tribe; the Tulalip Tribes of Washington; the Stillaguamish Tribe of Indians; the Upper Skagit Indian Tribe; the Swinomish Tribal Community; and the Squaxin Island Tribe, Plaintiffs,

v.

James Earl CARTER, President of the United States; Cecil D. Andrus, Secretary of the Interior; Guy R. Martin, Assistant Secretary of the Interior for Land and Water Resources; Gary J. Wicks, Deputy Secretary of the Interior for Land and Water Resources; Frank Gregg, Director of the Bureau of Land Management; the United States of America; the United States Department of the Interior; the Bureau of Land Management; the Northern Tier Pipeline Company, Defendants.

CITY OF PORT ANGELES, a municipal corporation of the state of Washington; and Clallam County, a political subdivision of the state of Washington, Plaintiffs,

v.

UNITED STATES of America; DEPARTMENT OF THE INTERIOR, United States of America; Bureau of Land Management, Department of the Interior; Cecil D. Andrus, Secretary of the Interior; Frank Gregg, Director of the Bureau of Land Management; and Northern Tier Pipeline Company, a Delaware corporation, Defendants.

Civ. A. Nos. C80–360M, C80–369M and C80–553S.

United States District Court, W. D. of Washington.

Feb. 9, 1981.

338

Craig A. Ritchie, Doherty, Doherty & Ritchie, Port Angeles, Wash., for No Oilport plaintiffs.

Craig L. Miller, City Atty., Port Angeles, Port Angeles, Wash., for City of Port Angeles plaintiff.

Grant S. Meiner, Pros. Atty., Clallam County, Port Angeles, Wash., for Clallam County plaintiff.

Russell W. Busch, Evergreen Legal Services, Native American Project, Seattle, Wash., Stephen V. Quesenberry, Skokomish Tribal Office, Shelton, Wash., Donald S. Means, Peter J. Wilke, P. S., Swinomish Tribal Community, Bellevue, Wash., Robert D. Wilson-Hoss, Squaxin Island Tribe, Shelton, Wash., for Indian Tribes plaintiffs.

John C. Merkel, U. S. Atty., David E. Wilson, Asst. U. S. Atty., Seattle, Wash., Lois J. Schiffer, Andrew F. Walch, Nancy B. Firestone, Attys., Dept. of Justice, Land and Natural Resources Div., Washington, D. C., for Federal defendants.

Robert H. Loeffler, Alan Cope Johnston, Steven S. Rosenthal, Morrison & Foerster, Washington, D. C., Gordon G. Conger, Larry M. Carter, Preston, Thorgrimson, Ellis & Holman, Seattle, Wash., for Northern Tier Pipeline Co. defendant.

## OPINION

BELLONI, District Judge:

## I. INTRODUCTION

This litigation consists of three consolidated cases in which plaintiffs seek to block construction of an oil pipeline which is proposed to originate in Port Angeles, Washington, and terminate in Clearbrook, Minnesota. Plaintiffs in Civil No. 80–360 are a number of environmental groups; they shall be collectively referred to as No Oilport. Plaintiffs in Civil No. 80–369 are the City of Port Angeles, Washington, and Clallam County, Washington; they shall be collectively referred to as The City. Plaintiffs in Civil No. 80–553 are a number of Indian tribes which are located in the State of Washington, primarily near Puget Sound; they shall be collectively referred to as the Tribes. In all three cases defendants are the corporation which proposed the pipeline and which will build it, if permitted, Northern Tier Pipeline Co., and a number of officials of the United States. Northern Tier Pipeline Co. shall be referred to as NTPC. The remaining defendants shall be referred to as the Federal Defendants, unless only a particular defendant is involved.

Plaintiffs seek to set aside two governmental actions. First, the selection by President Carter of NTPC's proposed west to east crude oil transportation system for purposes of Title V of the Public Utility Regulatory Policies Act (hereafter PURPA), 43 U.S.C. § 2001 et seq. Secondly, the issuance by the Secretary of the United States, Department of the Interior of a right-of-way permit to NTPC for purposes of the proposed oil pipeline. Plaintiffs attack the two actions based upon numerous grounds, with the result that an extraordi-

nary number of issues must be resolved. I have divided the issues into four major groups: 1.) issues arising under PURPA; 2.) issues arising under the National Environmental Policy Act (hereafter NEPA), 42 U.S.C. § 4321 et seq.; 3.) issues arising under the Mineral Leasing Act (hereafter MLA), 30 U.S.C. § 181 et seq.; and, 4.) all other remaining issues. The issues arising under PURPA concern the President's selection of the NTPC project. All other issues primarily concern the Secretary's issuance of the right-of-way permit.

These cases are unique in that Congress has explicitly mandated that they be expedited. 43 U.S.C. § 2011(c).[1] As a result of this Congressional mandate and as a result of the extraordinary number of issues presented, this court will not be discussing each of the numerous issues in as much detail as otherwise might be the case. However, nearly every issue will be addressed and each and every issue has been given careful consideration.

The court has jurisdiction over the subject matter of the actions pursuant to 28 U.S.C. § 1331. The actions are primarily review of informal agency decision making, as authorized in 5 U.S.C. § 706. The actions are presently before the court on the defendants' motions for summary judgment, various motions to strike certain exhibits submitted in opposition to the motions for summary judgment and No Oilport and The City's motions for partial summary judgment.[2] No Oilport has moved for summary judgment with respect to its claims under PURPA, NEPA, MLA, the Magnuson Amendment to the Marine Mammal Protection Act, 33 U.S.C. § 476, and the Coastal Zone Management Act, 16 U.S.C. § 1451 et seq. The City has moved for summary judgment with respect to their claims under the Magnuson Amendment and the Coastal Zone Management Act.

## BACKGROUND

The occurrences which resulted in this litigation can be traced back as far as 1968 when the largest crude oil reservoir in the Western Hemisphere was discovered at Prudhoe Bay on the North Slope of Alaska. In June, 1977, the Trans-Alaska Pipeline System was put into operation, thereby allowing delivery of North Slope crude oil to Valdez, Alaska. Since 1977, upon reaching Valdez, the crude oil has been pumped onto tankers for delivery to refineries. At the present time, much of the crude oil is delivered to, and refined on, the west coast of the United States. However, the crude oil which is in excess of the capacity of west coast refineries must be shipped through the Panama Canal to ports located on the Gulf Coast and in the Virgin Islands. From there, the crude oil is either refined locally or shipped to refineries located on the east coast of the United States.

As early as 1976, construction of a west to east oil pipeline to avoid the necessity of shipment through the Panama Canal was proposed. The original proposal called for a pipeline from Long Beach, California, to Midland, Texas; however, the project was later abandoned. At about this same time during the late 1970's, predictions were being made that due to a decrease in oil imports from Canada, refineries located in the northern tier states would not have sufficient oil supplies to operate at full capacity.[3] The pipeline project under consideration today was proposed to remedy both the problem of excess crude oil on the west coast having to be shipped through the Panama Canal and the anticipated problem of a

1. This provision is one aspect of PURPA. This provision, the other requirements of PURPA, and the context in which these actions arise will be discussed in more detail subsequently.

2. Two additional motions presently before the court are the motions to participate as amicus curiae recently submitted by the State of Montana and the State of North Dakota. These motions are denied. The position taken by these two states is adequately represented by the parties to the action. Furthermore, the lateness of the request to participate effectively removed whatever value which might have been derived from an amicus brief.

3. The northern tier states, as defined in 43 U.S.C. § 2003(1), are Washington, Oregon, Idaho, Montana, North Dakota, Minnesota, Michigan, Wisconsin, Illinois, Indiana and Ohio.

shortage of crude oil in the northern tier states.

As proposed, the NTPC system would originate at a terminal dock in Port Angeles, where the crude oil would be unloaded from tankers arriving from Alaska and pumped into the pipeline. From Port Angeles, the project calls for the pipeline to cross beneath Puget Sound and then to continue to head east, passing through eastern Washington, Idaho, Montana, North Dakota and finally terminating in Clearbrook, Minnesota, where it will connect with a pipeline system already in existence. Although the pipeline is proposed to be nearly 1,500 miles long, plaintiffs are primarily concerned with the potential effects of the pipeline on the areas of western Washington through which the pipeline is scheduled to pass.[4] Plaintiffs are particularly concerned about possible degradation of Puget Sound.

*INTRODUCTION TO PURPA*

The context in which these actions arise cannot be fully understood unless one is at least somewhat familiar with PURPA (Title V of the Public Utility Regulatory Act, 43 U.S.C. § 2001 *et seq.*). More than anything else, PURPA is designed to expedite action on federal permits required for the construction of a west to east crude oil transportation system. In enacting PURPA, Congress set out the following findings:

(1) a serious crude oil supply shortage may soon exist in portions of the United States;

(2) a large surplus of crude oil on the west coast of the United States is projected;

(3) any substantial curtailment of Canadian crude oil exports to the United States could create a severe crude oil shortage in the northern tier States;

(4) pending the authorization and completion of west-to-east crude oil delivery systems, Alaskan crude in excess of west coast needs will be transshipped through

the Panama Canal at a high transportation cost;

(5) national security and regional supply requirements may be such that west-to-east crude delivery systems serving both the northern tier States and inland States are needed;

(6) expeditious Federal and State decisions for west-to-east crude oil delivery systems are of utmost priority; and

(7) resolution of the west coast crude oil surplus · and the need for crude oil in northern tier States and inland States require the assignment and coordination of overall responsibility within the executive branch to permit expedited action on all necessary environmental assessments and decisions on permit applications concerning delivery systems.

43 U.S.C. § 2001.

Additionally, Congress set out the following purposes for which PURPA was enacted:

(1) to provide a means for—

(A) selecting delivery systems to transport Alaskan and other crude oil to northern tier States and inland States, and

(B) resolving both the west coast crude oil surplus and the crude oil supply problems in the northern tier States;

(2) to provide an expedited procedure for acting on applications for all Federal permits, licenses, and approvals required for the construction and operation of any transportation system approved under this title . . . ; and

(3) to assure that Federal decisions with respect to crude oil transportation systems are coordinated with State decisions to the maximum extent practicable.

43 U.S.C. § 2002.

The PURPA statutory scheme, reduced to its bare essentials, calls for the President to select a particular west to east oil pipeline project based on enumerated criteria and then for the chosen project to receive favor-

---

**4.** Due to a special statute of limitations included within PURPA, 43 U.S.C. § 2011(b), the actions presently before the court are the only actions which can challenge the President's se-

lection of the NTPC proposal for purposes of PURPA and the Secretary's issuance of the right-of-way permit.

able treatment, all of which is designed to avoid undue delay in the permitting process and judicial review thereof. In addition to mandating expedited judicial review, PURPA also establishes a 60 day statute of limitations and prohibits the issuance of preliminary injunctive relief. 43 U.S.C. § 2011(b) and (c). In addition to requiring that all permits be acted upon on an expedited basis, 43 U.S.C. § 2009(a), it also required that the Environmental Impact Statement be completed by a certain date. 43 U.S.C. § 2006(b). Finally, the statute also authorized the waiver of federal law, 43 U.S.C. § 2008; however, this provision was never implemented.

To assist the President in selecting a particular system to receive the benefits of PURPA, various agency heads were directed to make recommendations to the President. 43 U.S.C. § 2005(c). Primary responsibility was placed upon the Secretary of the Department of the Interior. Not only was he required to make recommendations, but he was also directed to establish an expedited schedule for review of the applications submitted by parties seeking to obtain the benefits of PURPA. 43 U.S.C. § 2005(a).

A number of applications were submitted. After the review process was completed and after the various agency heads made their recommendations, President Carter selected NTPC's proposal as the project to receive the benefits of PURPA. However, this alone did not authorize NTPC to begin construction. A number of permits still needed to be obtained. The President's selection of the NTPC project merely meant that various federal agencies were directed to expedite the permitting process with respect to NTPC's proposal.

On April 21, 1980, the Secretary of the Interior granted to NTPC the required right-of-way permit.

Additional required permits are still outstanding; however, they are not at issue in this litigation. As previously mentioned, plaintiffs in this litigation seek to set aside the President's selection of the NTPC project for purposes of PURPA and to set aside the Secretary's issuance of the right-of-way permit.

## II. SCOPE OF REVIEW—MOTION TO STRIKE

These cases are primarily review of non-adjudicatory, non-rulemaking agency action pursuant to 5 U.S.C. § 706. The scope of the review which this court should undertake has been a contested issue. It first arose in connection with the Federal Defendants' motion to limit review to the administrative record. The issue is now once again before the court in relation to the defendants' motions to strike certain documents submitted by plaintiffs.

As I stated in denying the Federal Defendants' motion to limit review to the administrative record, the most enlightening case in the Ninth Circuit on this issue is *Asarco v. U.S.E.P.A.*, 616 F.2d 1153 (9th Cir. 1980). The *Asarco* court held that where an administrative decision is being challenged as arbitrary and capricious, the "focal point" of review must be the administrative record, citing *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The court then went on to set out three instances in which a reviewing court may consider evidence outside of the record which is relevant to the substantive merits of the agency's decision.

If the reviewing court finds it necessary to go outside the administrative record, it should consider evidence relevant to the substantive merits of the agency action only for *background information,* as in *Bunker Hill,* or for the limited purpose of *ascertaining whether the agency considered all of the relevant factors or fully explicated its course of conduct or grounds of decision.* Consideration of the evidence to determine the correctness or wisdom of the agency's decision is not permitted even if the court has also examined the administrative record. *Asarco,* 616 F.2d at 1159–1160 (emphasis added).

All of the documents which defendants have moved to strike as beyond the proper scope of review have been submitted for the

purpose of establishing that the defendants failed to comply with NEPA in that the Environmental Impact Statement (hereafter EIS) is inadequate. In such circumstances the *Asarco* exceptions must be supplemented. *County of Suffolk v. Secretary of the Interior*, 562 F.2d 1368 (2nd Cir. 1977); *American Petroleum Institute v. Knecht*, 456 F.Supp. 889 (C.D.Cal.1978), affirmed 609 F.2d 1306 (9th Cir. 1979). *Asarco* does not address the situation in which the adequacy of an EIS is at issue. Instead, it only concerns evidence which goes to the substantive merits of the administrative decision. The *County of Suffolk* opinion explains the need for somewhat relaxed admissibility when the adequacy of an EIS is at issue as follows:

> Nor was the court obligated to restrict its review to the administrative record. Although the focus of judicial inquiry in the ordinary suit challenging non-adjudicatory, non-rulemaking agency action is whether, given the information available to the decision-maker at the time, his decision was arbitrary or capricious, and for this purpose "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court," *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), in NEPA cases, by contrast, a primary function of the court is to insure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives, (citations omitted) which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored.

> A suit under NEPA challenges the adequacy of part of the administrative record itself—the EIS. Glaring sins of omission may be evident on the face of the statement. (citations omitted). Other defects may become apparent when the statement is compared with different parts of the administrative record. (citations omitted). Generally, however, allegations that an EIS has neglected to mention a serious environmental consequence, failed to adequately to discuss some reasonable alternative, or otherwise swept "stubborn problems or serious criticism ... under the rug," *Silva v. Lynn* [1 Cir.] 482 F.2d at [1282] 1285, raise issues sufficiently important to permit the introduction of new evidence in the district court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination no such statement is necessary. 562 F.2d at 1384–1385.

The Court went on to limit the type of evidence properly admissible, as follows:

> The evidence introduced for the first time in the district court, however, would be probative only insofar as it is intended to show either that the agency's research or analysis was clearly inadequate or that the agency improperly failed to set forth opposing views widely shared in the relevant scientific community. 562 F.2d at 1385.

█ In applying these rules to the documents challenged by defendants' motions to strike, I find that all of the documents are admissible.

The challenged documents are admitted for the limited purpose of demonstrating the inadequacy of the EIS, except for the affidavits of Mr. Somers and Mr. Kay, both of which are also properly admissible as to the treaty rights issue. Finally, I note that the admission of extrinsic evidence on the issue of adequacy of an EIS appears to be the normal practice in the Ninth Circuit. See *Cady v. Morton*, 527 F.2d 786, 796 (9th Cir. 1975); *Trout Unlimited v. Morton*, 509 F.2d 1276, 1281 (9th Cir. 1974); *Life of the Land v. Brinegar*, 485 F.2d 460 (9th Cir. 1973), cert. denied, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *American Petroleum Institute v. Knecht*, supra; *Citizens Against Toxic Sprays, Inc. v. Bergland*, 428 F.Supp. 908 (D.Or.1977).

█ Plaintiffs question whether the affidavit of Mr. Eizenstat submitted by the Federal Defendants is properly admissible.

I find that the affidavit is admissible under one of the exceptions set out in *Asarco.* Specifically, *Asarco* allows extrinsic evidence to fully explicate the decision-maker's course of conduct or grounds of decision. The concept of allowing the decision-maker to supplement his decision through affidavits was specifically approved in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Eizenstat affidavit falls within this well established exception to the rule that review should be limited to the record.

## III. ISSUES ARISING UNDER PURPA

■ Plaintiff No Oilport and the plaintiff Tribes allege that both the President and the Secretary of the Department of the Interior (hereafter Secretary) violated PURPA. The vast majority, if not all, of the alleged violations relate to PURPA's procedural requirements. In most instances the President is alleged to have violated a procedure established by PURPA; in some instances the Secretary is alleged to have violated a procedure established by PURPA. However, in at least one instance it appears that plaintiff No Oilport is challenging the actual substance of the President's decision. It is clear that this court may review both the Secretary's and the President's actions to determine whether they complied with the procedural requirements imposed by PURPA. *NTEU v. Nixon*, 492 F.2d 587, 613 (D.C.Cir.1974); *Sneaker Circus v. Carter*, 457 F.Supp. 771, 782 (E.D.N.Y.1978), aff'd 614 F.2d 1290 (2nd Cir. 1979). To what extent this court can review the President's substantive decision is a point of contention which will be subsequently addressed; first, I want to address the numerous alleged procedural violations.

### A. Alleged Procedural Violations by the Secretary

No Oilport and the Tribes allege that the Secretary violated 43 U.S.C. § 2005(c) in three different manners. Among other

things, § 2005(c) required various federal agency heads to make recommendations to the President concerning which pipeline system should be selected for purposes of PURPA. These recommendations were to be first submitted to the Secretary of the Interior who was to make them available for comment, then the recommendations and the comments were to be forwarded by the Secretary to the President for his consideration.

**1.) *Alleged Failure to Circulate Comments***

■ First, No Oilport contends that § 2005(c) was violated in that the Secretary did not circulate federal and state agency comments. Defendants respond that the statute does not require circulation of comments but only that the comments be made available and that such was done. Defendants are correct on this issue.

**2.) *Alleged Failure to Forward Comments***

Second, No Oilport alleges that § 2005(c) was violated in that the Secretary did not forward the comments of state and local governments and the public to the President. Defendants acknowledge that the Secretary did not forward the above mentioned comments; however, they point out that he did forward summaries of the comments and he informed the President that the comments were on file and available. Defendants contend that this satisfies the requirements of PURPA.

■■ PURPA states that the "Secretary ... shall forward such comments to the President ..." It does not provide for the summarizing of comments. Nonetheless, I am of the opinion that the procedure used satisfies the requirements of the statute; summarizing the comments and making them available upon request is equivalent to "forward[ing]" them.[5]

---

5. No Oilport states in its memorandum of law in opposition to defendants' motions for summary judgment that it submitted comments to the Secretary and that they were not only not forwarded to the President but also not even summarized. In this regard, I note that arguments presented by counsel in legal memorandums are not sufficient to raise an issue of fact such that summary judgment is precluded.

3.) *Alleged Failure to Allow Public Comment*

The third alleged violation of § 2005(c) by the Secretary is that he did not make the comments of state and local government officials "available to the public and provide an opportunity for submission of written comments." § 2005(c)(2)(B). On August 16, 1979, the Secretary published in the Federal Register the recommendations of the various federal agencies and stated that both state and local governments, and the public, could comment on the recommendations from August 24, 1979 to September 28, 1979. The notice further provided that the comments of state and local governments would be on file in Washington, D. C. for examination.

§ 2005(c) of PURPA contemplates that the public have an opportunity to comment on not only the recommendations of the federal agencies but also the comments of local and state governments. It is this "right" which plaintiffs contend has been denied. They argue that because the period for state and local government comments terminated on the same date as the period for public comments, it was impossible for the public to comment on all of the state and local government comments.

§ 2005(c) requires that the Secretary make the governmental "comments available to the public and [that he] provide an opportunity for submission of written comments." § 2005(c)(2)(B). The record establishes that the Secretary clearly fulfilled the first aspect of this obligation; the governmental comments were made available to the public. The more difficult issue is whether the public had an opportunity to comment on the governmental comments. As to governmental comments submitted early on in the approximately one month comment period, the requisite opportunity clearly existed. As to the comments received very late in the comment period, if any were so received, it is possible that the opportunity did not exist. Plaintiffs have not shown, by affidavit or document, that they were denied an opportunity to comment on any particular governmental comment. In light of this, defendants must prevail on this issue.

B. *Alleged Procedural Violations by the President*

The President's primary obligation under PURPA was to determine which, if any, of the proposed west to east oil transportation systems should receive the benefits of expedited permitting, expedited judicial review, etc. accorded by PURPA. 43 U.S.C. § 2007. In reaching this decision the President was directed to consider various factors. 43 U.S.C. § 2007(b). Additionally, the President was directed to make findings concerning the factors and to publish these findings along with his ultimate decision in the Federal Register. 43 U.S.C. § 2007(c). Plaintiffs contend that the President violated the procedural aspects of this decision making process in at least four different manners.

1.) *Alleged Failure to Make Decision*

First, plaintiff No Oilport makes the seemingly outlandish allegation that the President failed entirely to make the required decision as to which oil transportation system should receive the benefits of PURPA. In support of this contention No Oilport points out that the decision which was published in the Federal Register is not a statement by the President, but rather a summary of the President's decision prepared by the Secretary.

In response to this contention, the Federal Defendants submitted an affidavit by Stuart Eizenstat, President Carter's Advisor on Domestic Affairs and Policy at the time of the decision. Mr. Eizenstat states that on January 17, 1980, President Carter announced that he had selected the oil pipeline proposal submitted by NTPC for purposes of PURPA. Additionally, Mr. Eizenstat states that the President directed him to instruct the Secretary to take care of the required publication of the decision in the Federal Register and that he carried out this direction. Moreover, Mr. Eizenstat

states that the summary of the President's decision prepared by the Secretary which appeared in the Federal Register is accurate.

I find that Mr. Eizenstat's affidavit removes any doubt, if indeed there was any doubt, as to whether the President made the decision required by PURPA.

### 2.) *Alleged Failure to Make Findings*

As previously indicated, PURPA required the President to make findings on a number of criteria. 43 U.S.C. § 2007(b). Plaintiffs allege that the President failed to make any findings. Alternatively, plaintiffs allege that the President failed to make findings on criteria B, E and J and failed to make a finding that the NTPC proposal is in the national interest.

#### a.) *Alleged Failure to Make Any Findings*

■ The decision published in the Federal Register does not make findings on the various criteria. However, it adopts as findings the recommendation prepared by the Secretary of the Interior which does address the various criteria. Plaintiffs make much of the fact that the Secretary of the Interior prefaced his recommendation with a statement to the effect that it did not constitute findings but was only advisory. I do not find this statement significant; it does not prohibit the President from adopting the report as his findings.

#### b.) *Criterion B*

Plaintiffs contend that even if the Secretary's recommendation is accepted as the President's findings, that the President failed to make findings with respect to all of the criteria, specifically criterion B, criterion E, and criterion J.

■ Criterion B is "the amount of crude oil available to northern tier states and inland states under each of such systems." An examination of the Secretary's report which the President adopted as his findings shows that findings were made with respect to this criterion. At pages 53–62 of Administrative Record (hereafter A.R.), exhibit 8.50, the President sets out detailed findings with respect to predicted shortages and surpluses of crude oil in the various states.

#### c.) *Criterion E*

■ Criterion E is "feasibility of financing for each of such systems." At pages 73 and 74 of A.R. 8.50, the President makes findings "with respect" to criterion E. These findings are not specific, but rather general in nature. The President does not find that one proposal is financially feasible and that another is not. Instead, his findings concern the general nature of the financing market for such a project. He concludes that "U.S. capital markets do have the capacity to supply the basic funds required" to whichever applicant is chosen.

It is possible that the President's findings are not as complete as Congress might have intended. Nonetheless, the President's findings with respect to criterion E are not so incomplete as to constitute a violation of the duties imposed by PURPA.

#### d.) *Criterion J*

■ Criterion J is "impact upon competition by each system." Plaintiffs correctly point out that the Secretary's report to the President did not address this criterion. However, the affidavit of Stuart Eizenstat, previously discussed, explains this apparent error. Mr. Eizenstat states:

In making his decision, the President considered each of the criteria he was required to consider under Section 507(b) of PURPA and adopted the findings contained within Interior's *Report to the President: West to East Crude Oil Transportation Systems*, as his findings with respect to all of said criteria except for criterion J. With respect to criterion J, which required that the President consider the impact of each of the four proposed systems upon competition, the President depended upon the FTC's *Report to the President on Proposed Northern Tier Oil Pipelines* as the basis for his finding that the Northern Tier proposal will not interfere with the maintenance of competitive markets.

Therefore, apparently the President did make a finding with respect to criterion J. What effect, if any, the apparent lack of publication of this finding has will be subsequently discussed.

### e.) *National Interest*

Plaintiffs contend that the President was required to make a finding on whether or not the particular proposal selected is in the national interest and that he failed to do so.

First, it should be noted that this is not an area in which the President was required to make a written, published finding. Rather, the statute simply requires that the "decision" to approve a particular system "include a determination that construction and operation of such system is in the national interest ..." § 2007(a)(2). The President found that a west to east transport system is in the national interest and that the NTPC proposal was the best proposal. Based on these two findings one must necessarily infer that the President determined that the NTPC proposal was in the national interest.

### 3.) *Alleged Failure to Publish Decision and Findings in the Federal Register*

Plaintiffs point out that PURPA specifically required the President to publish his decision and his findings in the Federal Register. 43 U.S.C. § 2007(c). Plaintiffs contend that he did neither. We have already seen that he published his decision through the Secretary. Whether he published his findings is a closer question; however, it must be resolved against plaintiffs.

The notice in the Federal Register which summarized the President's decision adopts the report of the Secretary and states how copies of it may be obtained. In one sense, therefore, the findings were not published in the Federal Register. On the other hand, the procedure used was equivalent to and therefore satisfies what PURPA called for the President to do. Certainly the purpose of the statutory requirement was fulfilled.

The above analysis is incomplete in one respect. As previously discussed, the Secretary's report did not address criterion J. Although it was addressed in the FTC's report, the President did not, in his published decision, adopt this report as part of his findings. Therefore, although based on Mr. Eizenstat's affidavit I have concluded that the President did make a finding with respect to criterion J, the President did not publish this finding. Nonetheless, it would be entirely unreasonable to void the entire Presidential decision making process, as plaintiffs request, simply because one finding, out of approximately 16 findings, was not published as required. Plaintiffs have not established that they were prejudiced by the lack of publication. I find the error to be harmless. *Cf.*, 5 U.S.C. § 706 (last sentence). (Harmless error committed by an agency is not grounds for reversal of agency action.)

### 4.) *Alleged Failure to Submit Explanation of Delay*

PURPA required the President to make his decision within 45 days of receipt of the Secretary's recommendation, unless he notified Congress that he needed more time and "submit[ted] a full explanation of the basis for such delay." 43 U.S.C. § 2007(a)(1). Plaintiffs contend that this provision was violated. Defendants deny the allegation and alternatively assert that plaintiffs lack standing to raise this issue.

I do not reach the standing issue, because I find that the President complied with the statutory requirement. The President did not make his decision within 45 days of receipt of the Secretary's recommendation; however, he submitted the following explanation for his delay:

> Pursuant to [PURPA], by this letter I am notifying you of my determination that additional time will be required to permit thorough consideration of the Secretary's recommendation, and of additional information on unresolved issues.

A.R. 8.58; 8.59.

PURPA did not require anything else on the part of the President in this regard.

### 5.) Alleged Untimeliness of NTPC Proposal

 PURPA required all proposals to be submitted not later than 30 days after November 9, 1978. NTPC submitted its proposal on December 7, 1978, and thereby met the cutoff date. The fact that in March, 1979, NTPC changed a portion of the proposed route is not significant. PURPA did not prohibit route changes. The NTPC proposal was timely submitted.

### C. Alleged "Substantive" Violations by the President

Plaintiff No Oilport's final four allegations which relate to PURPA are characterized by defendants as substantive attacks upon the President's decision. In this regard, defendants make an argument based on *Chicago & Southern Airlines v. Waterman Steamship Corp.*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), to the effect that since the President's decision included national security and foreign affairs factors, see 43 U.S.C. § 2007(b)(1)(I) and (N), this court is precluded from reviewing the substance of the President's decision.

First of all, No Oilport contends that these allegations do not attack the substance of the President's decision, but rather only point out how the President failed to comply with PURPA. I agree with this assessment as to three of the allegations, but disagree as to the fourth. I note that all four allegations are conclusory and somewhat ambiguous. I find all four of the allegations to be without merit.

### 1.) Alleged Unlawful Delegation of Ultimate Decision to Private Marketplace

 No Oilport alleges that the President unlawfully delegated his authority to approve or disapprove the project to the marketplace. No Oilport is misunderstanding the entire essence of PURPA. All PURPA called for was for the President to decide which, if any, of various applicants should be entitled to the procedural benefits provided by PURPA. The President made

this decision. The ultimate decision on whether the pipeline will be built does rest in the hands of private interests. It must necessarily so rest since it is a private project; it is not funded by the government.

### 2.) Alleged Unlawful Delegation of Authority to Make Finding on the Need of the Project to the Marketplace

No Oilport alleges that the President unlawfully failed to make a finding with respect to the need of the project and delegated the authority to do so to the private marketplace. By this allegation plaintiff is simply raising again its contention that the President failed to make a finding with respect to criterion B. This issue has previously been resolved adversely to plaintiff's contention.

### 3.) Findings Do Not Support Decision

No Oilport alleges that the President based his decision on findings which do not support the decision. Based on its legal memorandum, it appears that No Oilport's two major contentions in regard to this allegation are that the President took into consideration the fact that the NTPC proposal is capable of carrying crude oil out of the northern tier states should an excess ever develop, whereas PURPA does not list this as a criterion, and that, once again, the President failed to make a finding with respect to criterion B.

 Both of these contentions are without merit. The criterion B issue has already been resolved. As to the President's apparent consideration of factors beyond the specified criteria, such consideration is specifically authorized by PURPA itself. 43 U.S.C. § 2007(b)(1)(P).

### 4.) Findings Not Supported by Record

No Oilport alleges that the President "adopted findings which are not supported by facts on the record submitted to the President." In its argument No Oilport makes clear that this allegation relates to the President's so-called finding that the

NTPC proposal is capable of transporting crude oil both into, and out of, the northern tier states.

 The most simple response to this allegation is that nothing in PURPA or anywhere else required the President to base all of his findings solely "on the record submitted to the President." Therefore, this allegation fails to state a claim upon which relief can be granted.

 Moreover, I find that substantive review of the President's decision is not available under the present circumstances. PURPA specifically required the President, in reaching his decision, to consider the national security and foreign policy impacts of each proposal. The President explicitly relied upon these factors in making his decision.[6] 45 Fed.Reg. 6481. It is beyond the competence of the judiciary to review decisions based on such considerations. Additionally, no standards exist by which to review such a decision. Therefore, such decisions are not subject to judicial review. *C & S Airlines v. Waterman Steamship Authority*, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1938); *Braniff Airways, Inc. v. C. A. B.*, 581 F.2d 846 (D.C.Cir.1978).

### D. *Conclusion*

 The issues raised by No Oilport and the Tribes relating to PURPA are numerous, but uniformly without merit. The Secretary and the President adequately complied with the procedural requirements of the statute. The President's substantive decision, if adequately challenged on the merits, is unreviewable. No genuine issue of material fact exists and defendants are entitled to summary judgment as to all issues arising under PURPA.

## IV. ISSUES ARISING UNDER NEPA

### A. *Introduction*

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to prepare in relation to all proposed major actions significantly affecting the quality of the human environment a detailed statement setting forth the environmental impact of the proposed action, alternatives to the proposed action and other environmental factors. Additionally, it calls for public participation through public hearings and comments on the Draft Environmental Impact Statement.

Plaintiffs raise numerous issues in relation to NEPA. They can be classified into three categories: 1.) Miscellaneous procedural issues; 2.) Alleged inadequate evaluation of impacts; and, 3.) Inadequate evaluation of alternatives.

 NEPA's mandate to the agencies is essentially procedural. *Vermont Yankee Nuclear Corp. v. N. R. D. C.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); *Matsumato v. Brinegar*, 568 F.2d 1289, 1290 (9th Cir. 1974) (en banc). It is this court's obligation to determine whether the Secretary fully complied with the procedures mandated. Specifically, the Ninth Circuit Court of Appeals has stated that:

> An EIS is in compliance with NEPA when its form, content, and preparation substantially (1) provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of the information. *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974).

 I have performed a thorough study of the EIS. It is an impressive, four volume document. Although it was compiled on an expedited basis, pursuant to the mandate of PURPA, I evaluated its sufficiency without regard to this fact. I find the EIS to be thorough and complete; the Secretary has fully complied with NEPA's mandate. A more in-depth discussion of the various issues follows.

---

**6.** The result would probably not be changed even if the President had not given these factors substantial weight. *Braniff Airways, Inc. v. C. A. B.*, 581 F.2d 846, 850–52 (D.C.Cir.1978).

B. *Miscellaneous Procedural Issues*

### 1.) *Draft EIS on Other Proposals*

NEPA requires that both a draft EIS and a final EIS be prepared. Plaintiffs contend that the Secretary violated NEPA because he did not prepare a draft EIS for any of the proposed pipelines other than NTPC's proposed pipeline.

Defendants respond that the other proposals do appear in the Draft EIS, but that they appear as alternatives. They contend that the Council on Environmental Quality approved the procedure.

■■■ The Council on Environmental Quality approved the procedure by which the other proposals were treated as alternatives, provided that they were otherwise adequately evaluated. I find that the procedure used did not violate NEPA's requirement that a draft EIS be prepared. The other proposals were adequately covered. The mere fact that they were classified as alternatives is not significant.

### 2.) *Draft EIS on NTPC Proposal*

All plaintiffs contend that the Draft EIS does not address the NTPC proposal to lay submarine pipeline beneath Puget Sound.

■■■ NTPC did not announce its intention to change the route of its pipeline from around Puget Sound to across Puget Sound until after the Draft EIS was issued. Therefore, it was not possible to include the NTPC cross Sound route in the Draft EIS. Nonetheless, I find that this apparent deficiency was rendered harmless by other circumstances. First, it must be recognized that the primary reason for the requirement that a draft EIS be prepared is to allow public input. Under the circumstances presented here, this goal was achieved. The Draft EIS did contain, as an alternative, a similar cross Sound route. Therefore, individuals concerned about the impacts of crossing the Sound could have commented on this route. Moreover, due to the late change in route, the Secretary adopted the unusual procedure of allowing comments on the Final EIS.

### 3.) *Alleged Failure to Publish and Respond to Comments*

■■■ The Tribes and No Oilport allege that the Federal Defendants failed to publish and respond to comments submitted on the EIS as required by NEPA.

The Federal Defendants deny these allegations and point to portions of the administrative record to support their denial. They do acknowledge that certain comments which were not timely received may have not been published and may not have received a response. This, of course, is not required as to untimely comments.

Plaintiffs have failed to support their allegation that timely submitted comments were not responded to or published. The record indicates the contrary.

### 4.) *Notice to Tribes*

■■■ The Tribes contend that they were not given proper notice of the NEPA review process. Defendants deny this contention and rely on the administrative record.

The record establishes that the public received adequate notice of the NEPA review process. The majority of the Tribes responded to this notice by participating, to at least some extent, in the NEPA review process. NEPA requires nothing more.

### 5.) *NTPC's Participation in the Preparation of the EIS*

No Oilport and the Tribes make the vague, unsupported allegation that the Federal Defendants violated NEPA by failing to take responsibility for the preparation of the EIS, but instead delegated that responsibility to NTPC.

■■■ This contention needs little comment. Apparently, plaintiffs are objecting to the fact that NTPC supplied some of the data. Such a procedure is not contrary to NEPA. *Life of the Land v. Brinegar*, 485 F.2d 460, 467–68 (9th Cir. 1973). At the same time, however, I am not condoning wholesale delegation to the applicant. The facts of this case do not even approach such a delegation.

C. *Alleged Inadequate Evaluation of Impacts*

Title 42 U.S.C. § 4332 requires that every EIS contain a "detailed statement" of probable impacts upon the human environment. Plaintiffs allege that this requirement was violated in that the EIS fails to adequately evaluate or fails entirely to evaluate various environmental impacts.

■ The Ninth Circuit Court of Appeals has cautioned that the adequacy of an EIS "should be determined through use of the rule of reason. A reasonably thorough discussion of the significant aspects of the probable environmental consequences is all that is required by an EIS." *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974). I have applied this rule of reason and, as previously indicated, I find the EIS adequate in its evaluation of probable impacts. I shall now address the bulk of plaintiffs' specific allegations of inadequacy.

1.) *Impacts of Crossing Puget Sound*

Many of plaintiffs' allegations relate to the potential impacts of placing an oil pipeline in Puget Sound. Their greatest concern relates to the potential of oil spills and leaks from such a pipeline and their effect on the Sound. Plaintiffs contend that the impacts of crossing the Sound were not adequately analyzed.

An examination of the EIS disproves this contention. Indeed, a disproportionate amount of the EIS is directed to the impacts of crossing the Sound. Predicted oil spill frequency is discussed and evaluated, both as to minor and major spills. Predicted oil leakage is discussed and evaluated, both as to minor and major leaks. The impacts of minor and major spills and leaks are discussed, including the effect of a spill or leak on Indian fisheries. (The adequacy of the EIS in relation to potential impacts of the project on the Indians will be subsequently discussed.) The likelihood of the pipeline being snagged by an anchor is discussed in some detail. Furthermore, impacts associated with initial construction are considered.

■ The City contends that the study used to predict oil spill trajectories was inadequate. In support of this contention, they cite criticism of the study by the Army Corps of Engineers. However, plaintiffs have failed to demonstrate that the alleged defects were known at the time of the preparation of the study or the Final EIS. Of even more importance is that a supplemental oil spill analysis was provided to the Secretary. In response thereto, the Secretary indicated in his recommendation to the President that oil spills could have greater impact than what was shown in the EIS. See, A.R. 8.49 at 11. Finally, it must be pointed out that mere difference in opinion between experts is not grounds for finding an EIS inadequate. *Life of the Land v. Brinegar*, supra at 472.

2.) *Alleged Inadequacies Raised by The City*

The City contends that the EIS inadequately examines the impacts of the project, particularly the impacts of the oil terminal dock proposed to be built at Port Angeles, on the Port Angeles-Clallam County area. Some of The City's major allegations are that the EIS failed to consider adequately the impact of the proposal on Ediz Hook; that the EIS failed to consider adequately the effect of the oil terminal on air quality; that the EIS failed to consider adequately the drain on the region's electrical power supply; that the EIS failed to consider adequately secondary effects of the project, such as an alleged influx of petroleum based industry into the Clallam County area; that the EIS failed to consider adequately the impact of the project on social conditions in the Clallam County area; and that the EIS failed to consider adequately the impacts of the project on water supply and quality.

An examination of the EIS discloses that all of these subject areas were discussed and evaluated, many of them at great

length.[7] The impacts on Ediz Hook and the Port Angeles Harbor were given special attention. The socio-economic impacts of the project were, likewise, given extensive consideration. I am compelled to conclude that all of the beforementioned subject areas were adequately addressed by the EIS.

From reading plaintiffs' legal argument and examining their exhibits, it becomes apparent that plaintiffs are more concerned with the accuracy of the EIS as opposed to the extent it goes into detail in relation to the various subject areas. Nowhere is this more true than in relation to the impact of the oil terminal on air quality. The discussion of this subject in the EIS assumed that tankers entering Port Angeles Harbor would be burning low sulfur fuel. The City has submitted evidence tending to suggest that such fuel might not be available.

As previously stated, disagreement among experts does not render an EIS inadequate. *Life of the Land v. Brinegar,* supra at 472; *Cady v. Morton,* 527 F.2d 786, 796 (9th Cir. 1975). Furthermore, the EIS does express some amount of concern about the availability of low sulfur fuel. This concern was prompted by comments from the Environmental Protection Agency (EPA). See, Responses 2 and 50 to letter No. 86, Final EIS at 10–199, 10–201. NEPA does not require anything more.

Plaintiffs' other contentions are even less persuasive. Nonetheless, it is understandable that The City believes that the EIS should have discussed in more detail the impacts of the project on the Clallam County area. It is also not surprising that The City disagrees with some of the conclusions reached in the EIS. However, neither of these facts can justify a finding that the EIS is inadequate, in light of its thorough treatment of the impacts of the project on the Clallam County area.

### 3.) *Alleged Inadequacies Raised by No Oilport*

No Oilport contends that the EIS is inadequate in its discussion of the impacts of the project on the one hundred year flood plain; the impacts of spills in rivers and streams; the impact of the project on private land; the impact of the project on Montana fishery resources; and, the impact of "energy corridors" in Montana.

Each of these subject areas are discussed in the EIS. I find that the EIS is adequate as to each of them. One hundred year flood plain data was presented for 26 stream crossings. The EIS reports that such data was not available for 11 stream crossings in the Puget Sound area; however, watershed discharge data for these streams, including minimum and maximum flows, were presented. See, Final EIS 2–55, Table 2.1–50.

The impact of an oil spill in rivers and streams was extensively addressed. This area will be discussed in relation to the Tribes' contentions.

The impact of the project on private land is discussed at some point in all four volumes of the EIS. Land use near the proposed oil terminal is discussed at 2–24 through 2–27 and 2–100 through 2–105 of the Final EIS. The impacts on various private entities, such as Crown Zellerbach and ITT Rayonier, are discussed. Furthermore, the impact on private land is extensively discussed in relation to predicted economic and social impacts.

---

**7.** I have also considered the two new contentions very recently raised by The City, concerning possible relocation of a portion of the Ediz Hook Coast Guard Station and compliance with the National Historic Preservation Act, 16 U.S.C. § 470f. Both contentions are without merit.

As to the National Historic Preservation Act, 16 U.S.C. § 470f, historic properties were adequately identified in the EIS. Final EIS at 2–88 through 2–97. Moreover, before the Notice to Proceed may be issued, the requirements of the Act must be satisfied. A.R. 9.51, Stipulation B–7.

As to possible relocation of a portion of the Ediz Hook Coast Guard Station, the simple response is that such relocation is merely a possibility. "An EIS need not address remote and highly speculative consequences." *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir. 1974). Additionally, even if relocation did become necessary, it is not clear that relocation within the same general area constitutes a significant impact.

The impact of the project on Montana's fishery resource is adequately discussed. Stream sedimentation is discussed at 3–74, 3–75 and Table 3.2–12 of the Final EIS. The impact on aquatic resources is discussed at 3–78 through 3–79 and 3–82 through 3–86.

An "energy corridor" is the joint use of a right-of-way by a pipeline and high voltage electric transmission lines. The impacts and problems associated with such a use are adequately discussed at 1–12, 2–106, and 3–112 through 3–114 of the Final EIS.

No Oilport also contends that the EIS does not contain an adequately detailed statement on the effect of capital intensive energy projects as opposed to renewable, labor intensive projects; and on the need for the project generally. Both of these contentions are restatements of No Oilport's contention that the "no action" alternative did not receive adequate consideration. This basic contention shall be dealt with in the following section on alternatives.

 Finally, No Oilport contends that the EIS is inadequate in that it fails to address the impact of the project on the Magnuson Amendment to the Marine Mammal Protection Act, 33 U.S.C. § 476. I know of no authority which requires an EIS to address legal issues. (Note that the merits of plaintiffs' contentions relative to the Magnuson Amendment are discussed subsequently in Part VI.)

### 4.) *Alleged Inadequacies Raised by the Tribes*

Plaintiff Tribes hold extensive rights, pursuant to treaty, to take fish from their usual and accustomed fishing places in the Puget Sound area. The Tribes contend that the EIS is inadequate in its evaluation and consideration of the impacts of the project on these fishing rights. They contend that the EIS is inadequate in its consideration of the impact of the treaty fishery of placing the pipeline in Puget Sound and across various rivers and streams. Additionally, they contend that the EIS inadequately considers the social impact which

the project will have on members of the Tribes, particularly the impact of "boom towns." Furthermore, a number of additional contentions, which I characterize as of less significance, are also raised by the Tribes.

This project could affect the Tribes' take of fish in essentially four ways: 1.) the cross Sound pipeline could leak or rupture; 2.) pipelines across streams and rivers could leak or rupture; 3.) construction of pipelines across rivers and streams could cause an increase in sedimentation, thereby destroying spawning grounds; and, 4.) tankers bringing oil to Port Angeles could spill oil. The EIS acknowledges all of these possibilities and discusses the probability of such events occurring. The EIS discusses the effect on the fish resource of such events occurring. It points out that minor leaks would have little or no effect, whereas a major rupture could be devastating to the fish resource. The EIS acknowledges that a major rupture "could result in significant loss to Native American tribal fish enterprises in western Washington." Final EIS 5–9.

The impact of constructing the pipeline across rivers and streams is discussed at 3–78 through 3–86 of the Final EIS. Table 3.2–15 at 3–84 of the Final EIS summarizes the impacts of the project on streams in western Washington.

Furthermore, the map addendum is very informative. Among other things, it indicates the location of marine resources within the Strait of Juan de Fuca and Puget Sound; predicted oil spill trajectory; salmon fisheries for the Lower Elwha and Tulalip Indians; and, of course, the proposed route of the pipeline.

In summary, the EIS's treatment of the potential effect of the project on the Indian's fishing enterprises is informative, thorough and, perhaps most important, clearly sets out those hazards which do exist.

I also find that the treatment of the socio-economic impacts of the project on the Tribes is adequate. Much of the discussion of socio-economic impacts on the Clallam

County area is applicable to the Tribes, this is particularly true of the Lower Elwha Indians and the Makah Indians. The Final EIS at 2–37 through 2–43 presents relevant data on water related economic activities, income and employment.

The Tribes final major contention is that the project's impact on air and water quality was not adequately addressed. Here, the impact on the Tribes is essentially the same as the impact on the public generally. The Tribes are particularly concerned about potential pollution associated with the oil terminal proposed to be located in Port Angeles Harbor. The EIS offers extensive information on this subject. The impact of oil spills, both inside and outside of the harbor, are discussed at 2–8 through 2–14 and 3–35 through 3–45 of the Final EIS. The impact of the project on air quality is discussed at 2–1 through 2–4 and 3–20 through 3–27 of the Final EIS.

I find the EIS to be adequate in regard to the contentions raised by the Tribes.

### 5.) *Mandatory "Hook-up"*

In selecting NTPC as the entity to receive the benefits of PURPA, the President stipulated that NTPC must hook up its pipeline to the Puget Sound area refineries. Such a system could effectively remove all crude oil tankers from navigable waters east of Port Angeles and thereby protect the environment. At the present time, Puget Sound refineries are serviced directly by tankers. All plaintiffs contend that the EIS did not adequately address the impacts of constructing a spur line from the NTPC pipeline to the Puget Sound refineries. The President did not issue his mandate that the spur pipeline be constructed until after the Draft EIS had been published; therefore, the spur pipeline was not addressed therein. It is discussed in the Final EIS; however, time factors obviously limited the depth of the discussion. See, Final EIS 6–3 through 6–7. Indeed, the authors of the EIS acknowledge that a separate or supplemental EIS will likely be required to address the specific impacts of the spur pipeline. Final EIS at 6–3.

Defendants characterize the spur line as a separate and distinct aspect of the entire project, one which is independent of the rest of the project. They further point out that NTPC has not officially applied for a permit to construct the spur pipeline. For these reasons, defendants argue that the EIS can be evaluated, and approved, without regard to the spur pipeline which allegedly will be constructed.

█ I agree with defendants' contentions. Although President Carter stipulated that NTPC must make its pipeline available to Puget Sound area refineries in order to receive the benefits of PURPA, as yet NTPC has not set out a specific proposal by which "hook-up" will be implemented, nor has NTPC applied for a permit to construct the spur pipeline. Therefore, there presently is no proposed action for which an EIS must be prepared. Indeed, it is impossible to prepare an adequate EIS until the specifics of the proposal are known. See, *Kleppe v. Sierra Club*, 427 U.S. 390, 398–402, 96 S.Ct. 2718, 2724–2726, 49 L.Ed.2d 576 (1976).

It would be unreasonable to hold up the entire project until NTPC advances its proposal to implement "hook-up" and the Secretary prepares an EIS on it. The spur pipeline is a separate and independent aspect of the project. The rest of the system is completely functional without the spur pipeline. Such a delay would be directly contrary to Congress's directive that these actions be expedited. The adequacy of the EIS on the "hook-up" proposal can be reviewed once it is properly before the court. At this point, the court must assume that the Secretary will properly perform the duties imposed upon him by NEPA.

### D. *Alternatives*

NEPA requires that an EIS consider alternatives to the proposed governmental action. All plaintiffs contend that this requirement was not satisfied in one manner or another.

The Ninth Circuit has noted that this requirement is also subject to the rule of reason; the EIS simply must set forth suf-

ficient information to enable the decision-maker to make a reasoned choice between alternatives. *Westside Property Owners v. Schlesinger*, 597 F.2d 1214 (9th Cir. 1979). Having applied this rule to the EIS at issue today, I find that it adequately discusses alternatives. Plaintiffs' major contentions are discussed below.

### 1.) *No Action or Delay Alternative*

All the plaintiffs contend that the EIS fails to adequately consider the alternative of no action or delay.

These alternatives were specifically addressed at 9–1 of the Final EIS. Moreover, virtually the entire EIS describes impacts of the proposal which would not occur if the no action or delay alternative was accepted. In this regard, Chapter 2 describes the environment as it presently exists and Chapters 3, 5, 7, 8 and 9 describe the impacts on the environment of the project.

The question of the need for the project is necessarily involved when the no action alternative is considered. The need for the project is discussed in the Final EIS at pp. vi–ix and at 9–159 through 9–161. Moreover, the need for the project is discussed in great detail in the Department of Energy's report "Petroleum Supply Alternatives for the Northern Tier and Inland States to the Year 2000" (A.R. 8.56) which was referenced in the EIS and provided to the decision-makers.

I am of the opinion that these discussions meet the requirements of NEPA. See, *e. g. Farmland Preservation Ass'n v. Goldschmidt*, 611 F.2d 233, 238–39 (8th Cir. 1979) (a two paragraph discussion of the no action alternative held satisfactory).

### 2.) *Alternative Routes Across Puget Sound*

The Tribes and No Oilport contend that the EIS inadequately considered alternative routes across Puget Sound.

This contention is without merit. Alternative routes are discussed at pages 9–144 through 9–150 of the Final EIS. Moreover, the Trans Mountain proposal is an alterna-tive to the NTPC project. The Trans Mountain proposal is discussed at pages 8–22 through 8–144 of the Final EIS.

### 3.) *Alternative Ways of Handling Crude Oil*

The Tribes and No Oilport contend that the EIS is inadequate in that it fails to discuss alternative proposals for transporting foreign crude oil into the northern tier and inland states.

To the contrary, I find the discussion at 9–151 through 9–159 adequate. There the EIS discusses the Long Beach, California to Midland, Texas Pipeline; a Trans-Mexico pipeline; a Trans-Guatemala pipeline; a train system originating in Port Westwood, Oregon; the present system, shipment by tanker through the Panama Canal or around Cape Horn; and, trades with Canada. Furthermore, this final alternative was extensively discussed in the aforementioned report prepared by the Department of Energy.

### 4.) *Other Alternatives*

Plaintiffs' other contentions relative to alternatives allegedly not adequately considered are equally without merit. It must be remembered that the EIS considered four different proposals; each proposal is an alternative to the other proposals.

### E. *Summary and Conclusion as to NEPA Issues*

A comment is in order concerning the mass of exhibits submitted by plaintiffs in relation to the NEPA issues. These exhibits consisted primarily of expert opinion and internal governmental correspondence. Although I admitted all tendered evidence, much of it was of little significance, and indeed some of it was entirely irrelevant. The affidavit of James Beasley, for one, falls into this latter category; the personal knowledge, or lack thereof, of Mr. Beasley who is an employee of NTPC does not reflect upon the adequacy of the EIS.

The fact that certain individuals within the government, the most vocal of

which were members of the Army Corps of Engineers, felt that the EIS should be more detailed is of very little significance. In an organization the size of the United States government, conflict and disagreement necessarily will arise. The fact that it does arise shows a healthy system and helps assure that the EIS is properly prepared. Ultimately, however, it is up to the Courts alone to determine whether the EIS is adequate, not individual members of the administrative branch.

 Finally, plaintiffs' contention that evidence submitted raises issues of fact such that summary judgment is precluded is incorrect. Mere genuine issues of fact are not sufficient to preclude summary judgment; instead, the genuine issues must be of *material* fact. The submitted evidence raises issues of fact; however, due largely to the standard of review under which this action must proceed, I do not find any of the issues of fact raised to be material issues of fact. As stated at the outset of this section, NEPA is a procedural statute. *Vermont Yankee Nuclear Corp. v. N.R.D.C.*, supra; *Matsumato v. Brinegar*, supra. It is merely up to this court to determine if those procedures were followed.

 The EIS at issue today is not perfect. However, perfection is not required. In reviewing the adequacy of an EIS, the standard which must be applied is the "without observance of procedure required by law" standard of 5 U.S.C. § 706(2)(D). *Lathan v. Brinegar*, 506 F.2d 677 (9th Cir. 1974). I find that this standard has been satisfied. The "form, content, and preparation" of the EIS "substantially provide[d] the decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences and . . . [made] available to the public, information of the proposed project's environmental impact and encourage[d] public participation in the development of the information." *Trout Unlimited v. Morton*, supra at 1283. NEPA requires nothing more.

## V. ISSUES ARISING UNDER THE MINERAL LEASING ACT

On April 21, 1980, the Secretary of the Interior granted NTPC a right-of-way across federal lands for the purpose of laying its oil pipeline. The Mineral Leasing Act (MLA), 30 U.S.C. § 181 *et seq.*, establishes limitations upon the granting of such a permit. Plaintiffs contend that the permit was issued in violation of numerous requirements of the Act and, therefore, must be declared void.

### A. *Is NTPC Qualified to Hold the Permit?* §§ 185(a), 181

No Oilport and the Tribes contend that NTPC is ineligible to hold the permit, because it is owned by foreign citizens of a "non-reciprocating" country. 30 U.S.C. § 185(a) allows the Secretary to grant a right-of-way across federal land to any applicant "possessing the qualifications provided in section 181 . . ." Section 181 allows leases of federal land to:

> . . . citizens of the United States, or to associations of such citizens, or *to any corporation organized under the laws of the United States, or of any State* or Territory thereof, or in the case of coal, oil, oil shale, or gas, to municipalities. *Citizens of another country, the laws, customs, or regulations of which deny similar or like privileges to citizens or corporations of this country, shall not by stock ownership, stock holding, or stock control, own any interest* in any lease acquired under the provisions of this chapter. (Emphasis added.)

No Oilport and the Tribes contend that Kuwait is a non-reciprocating country and that it owns an interest in the permit. Specifically, the materials submitted tend to establish that Kuwait owns, or at least at one time owned, 200,000 shares of Getty Oil Co., that Getty Oil Co. owns 100% of the shares of Western Crude, Inc. and that Western Crude, Inc. owns 26% of the shares of NTPC.

First, I note that the parties agree that NTPC, Western Crude, Inc. and Getty Oil Co. are all corporations organized under laws of a State within the United States. Therefore, the issue presented is whether Kuwait, assuming that it qualifies as a "citizen" of a non-reciprocating country, owns any interest in the permit either by way of "stock ownership, stock holding, or stock control."

 Clearly, Kuwait does not own an interest in the permit by way of "stock ownership"; Kuwait does not own stock in NTPC. Nor does Kuwait own an interest in the permit by way of "stock holding or stock control." Both of these terms imply indirect control over the corporation which holds the permit, or at least indirect control over shares of stock in the corporation which holds the permit. It has not been contended, and certainly not shown, that Kuwait's small fractional ownership in Getty Oil Co. results in such control. Under the facts presented, Kuwait does not *"own"* any interest in the permit.

Additionally, I note, without deciding, that it appears unlikely that plaintiffs have standing to raise this issue. *Isaacs v. De-Hon,* 11 F.2d 943 (9th Cir. 1926). It does not appear that plaintiffs' injury, if any, is "arguably within the zone of interests to be protected or regulated" by § 181 of the Act. See, *Association of Data Processors v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Port of Astoria v. Hodel,* 595 F.2d 467 (1979).

### B. *Does the Right-of-Way Permit Violate § 185(b)(1)?*

Section 185(a) provides that the Secretary may grant a right-of-way over "federal lands." Section 185(b)(1) defines "federal lands" as "all lands owned by the United States except... lands held in trust for an Indian or Indian tribe..." Plaintiff Tribes contend that the grant of the right-of-way over certain land near Puget Sound violated this section. The Tribes correctly point out

that by virtue of certain treaties they hold a right of access to, and use of, usual and accustomed fishing sites. They assert that this right constitutes an interest in land and that the right-of-way crosses near or through it.

 I reject this novel argument.[8] In the Puget Sound area the only land owned by the United States through which the right-of-way passes is approximately 4½ miles of land on Whidbey Island Naval Reservation and approximately 1½ miles of land on Ediz Hook Coast Guard Station. None of this land is held in trust for an Indian tribe. Furthermore, the Indians' non-exclusionary easement which allows them access to their usual and accustomed fishing sites does not constitute "lands held in trust for an Indian or an Indian tribe" as the phrase is used in § 185(b)(1). I construe the Act as applying to lands held in fee.

### C. *Alleged Violations Relating to Ediz Hook Coast Guard Station—§ 185(b)(1) & (c)(2)*

Plaintiffs contend that the Secretary violated § 185(b)(1) and acted beyond his jurisdiction in granting the right-of-way through a portion of the Ediz Hook Coast Guard Station. I disagree with both contentions.

 The Secretary did not act beyond his jurisdiction. § 185(c)(2) applies to situations, such as the present one, in which a right-of-way will affect land administered by more than one agency. It provides that in such circumstances "the Secretary is authorized, after consultation with the agencies involved, to grant or renew rights-of-way or permits through the Federal lands involved." The record establishes that such consultation was undertaken. A.R. 9.38.

 The Secretary did not violate § 185(b)(1). This section provides in part:
A right-of-way through a Federal reservation shall not be granted if the Secre-

---

**8.** The Tribes have not submitted evidence which supports the underlying factual assertions of the argument.

tary or agency head determines that it would be inconsistent with the purposes of the reservation.

First, and most important, plaintiffs' contention that the Secretary of the Department of Transportation, who is the head of the agency which has jurisdiction over Coast Guard lands, determined that the right-of-way would be inconsistent with the purposes of the Coast Guard Station on Ediz Hook is not supported by the record. The Secretary of the Department of Transportation did state that granting of the right-of-way would necessitate relocation of the Coast Guard air rescue station presently located on Ediz Hook. This is not a determination that the right-of-way is inconsistent with the purposes of the reservation.

■ Moreover, in situations like the present in which the Secretary of the Interior is authorized to grant or deny the right-of-way by virtue of § 185(c)(2), as opposed to situations in which an agency head is authorized to grant or deny the right-of-way by virtue of § 185(c)(1), only the Secretary of the Interior's consistency determination is of any relevance.

### D. *Width Limitations on Right-of-Way—§ 185(d)*

Section 185(d) provides that "the width of a right-of-way shall not exceed fifty feet plus the ground occupied by the pipeline ... and its related facilities...'" Plaintiff Tribes and plaintiff No Oilport contend that the Secretary violated this provision in that the permit allegedly grants a 2 mile wide corridor.

The official grant of the right-of-way is within the statutory limitation. The right-of-way grant provides:

> The width of the RIGHT OF WAY hereby granted is 50 feet plus the ground occupied by the PIPELINE unless otherwise authorized as provided in § 28(d) of the Mineral Leasing Act." Right-of-Way Grant, p. 1; A.R. 9.51.

Defendants acknowledge, however, that the exact location of the right-of-way has not been determined, but rather at this time it is only known that the right-of-way will be located within a two mile wide corridor; exact location is scheduled to be determined at a later date.

In *Wilderness Society v. Morton*, 479 F.2d 842 (D.C.Cir.1973), a similar issue was presented in relation to the Trans-Alaska Pipeline. There, the Secretary had issued what he called "Special Land Use Permits." These permits allowed the constructing company to temporarily use land beyond the statutory width limitation during construction. The Secretary argued that these permits did not violate the statutory width limitation, because they did not constitute a "right of way." The Court rejected this argument and held that any use of land, even if only temporary, constitutes a right-of-way and is, therefore, subject to the width limitation. The Court held the procedure to be in violation of § 185.

■ I find that *Wilderness Society v. Morton*, supra, is distinguishable from the present action. Here, the right-of-way granted is within the 50 foot statutory width limitation. The two mile wide corridor merely refers to where the 50 foot right-of-way will be located. Furthermore, subsequent to *Wilderness Society v. Morton*, supra, Congress amended § 185 such that the Secretary now has authority to grant temporary permits to use land in the vicinity of a pipeline. 30 U.S.C. § 185(e). Apparently, no such permits have been issued as of this date; however, defendant NTPC as of this date has not entered the two mile wide corridor for the purpose of fixing the exact location of the right-of-way. Defendant's counsel assures the court that before any use of federal land in excess of the 50 foot right-of-way is undertaken that a temporary permit will be obtained pursuant to § 185(e). Until shown otherwise, I must assume that the law will be followed. The record before me does not establish any violation; by its own terms the right-of-way is within the statutory 50 foot width limitation.

### E. *Adequacy of Stipulations Imposed by Secretary. § 185(g), (h)*

Sections 185(g) and (h) require the Secretary to insure, through the use of stipula-

tions and requirements imposed upon the applicant, that construction and operation of the pipeline will not be a safety hazard nor damage the environment. No Oilport and the Tribes contend that the stipulations imposed upon NTPC are inadequate. Some of the things which plaintiffs contend have not been adequately protected are 1.) safety of the public and workers from "sudden ruptures and slow degradation of the pipeline"; 2.) "fish and wildlife habitat"; and, 3.) "the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife, and biotic resources of the area for subsistence purposes." 30 U.S.C. § 185(g) and (h).

 I have reviewed the stipulations imposed by the Secretary. They are numerous, extensive and broad in scope. Stipulations A–11, A–12, A–13, A–15, B–1, B–15, C–1, C–2, C–4, C–5, C–6, and C–8 are designed to protect the public's health and safety. Stipulations A–2E, A–12, B–1, B–2, B–4, B–6, B–10, and C–4 are designed to protect the environment. I find that the stipulations are adequate, except as to whether the habitat of the Tribes' treaty fishery has been adequately protected. As is more fully explained subsequently in the section on treaty rights, a genuine issue of material fact exists in relation to this issue. As to all other areas, plaintiffs have failed to demonstrate in which particular manner the stipulations are inadequate.

#### F. *Alleged Improper Sequence*

 Plaintiffs object to the fact that the right-of-way permit was issued before the precise location of the right-of-way was located and before compliance with the stipulations was assured.

Defendants respond that the Notice to Proceed with construction will not be issued until the exact location is fixed and compliance with all stipulations has been assured.

I do not find this procedure to be violative of the Mineral Leasing Act. It is not specifically prohibited and is consistent with all of the goals of the Act. Furthermore, the procedure furthered the goals of PURPA.

#### G. *Description of Plan § 185(h)(2)*

Section 185(h)(2) requires an applicant for a permit to submit "a plan of construction, operation, and rehabilitation." Plaintiffs acknowledge that a plan was submitted but contend that it was inadequate.

The applicable legislative history suggests that defendants' action must be affirmed. The Conference Report acknowledges that the plan is not expected or required to be a final plan.

> Section 28(h), relating to environmental protection does not require the plan for construction, operation, and rehabilitation of the right-of-way or permit area to be a final one, since all details and conditions cannot be known at the time of application. However, the plan should be a description in as much detail as the state of the planning for the particular project will permit and must be adequate enough for the Secretary or agency head to make an informed judgment on the application and on the need for imposing any special terms and conditions which the public interest may require. H. Conf. Rep. No. 93–624, 93rd Cong., 1st Sess., reprinted in (1973) U.S.Code Cong. & Ad.News, 2417, at 2527.

Furthermore, it appears that judicial review of the adequacy of the plan was intended to be extremely limited, as evidenced by the following discussion from the Senate floor:

> "Mr. STEVENS. Section 28(h)(2) requires an applicant for a new project which may have a significant impact on the environment to submit a plan of construction, operation, and rehabilitation. As stated in the conference report, it is not intended that such a plan be a final one since all details cannot be known at the time of application. *Is it contemplated that the Secretary or agency head will have the sole discretion to determine if a submitted plan is satisfactory?*
>
> Mr. JACKSON. *Yes. This, like every other discretionary determination which the Congress has authorized the Secretary to make; it is not intended that such*

*a determination be the subject of judicial review on any grounds other than an abuse of discretion."* 119 *Cong.Rec.* 36814 (1973). (Emphasis supplied).

 The plan submitted is not insubstantial. See A.R. 7.62(f). In light of the legislative history which strongly suggests that the initial plan need not be complete in every detail, it is my opinion that the plan submitted was sufficient.

## H. *Financial Status of NTPC § 185(j)*

Section 185(j) provides that the Secretary may only grant a permit "when he is satisfied that the applicant has the technical and financial capability to construct, operate, maintain and terminate the project." Plaintiffs contend that the Secretary violated this sub-section in relation to the financial capability of NTPC.

 First, it should be noted that the Secretary was not required to make a finding on this point, but rather only that he be "satisfied." Nonetheless, plaintiffs contend that the Secretary specifically stated in his decision (A.R. 9.52) that he was not making a determination on this issue, but instead turning it over to the marketplace. I disagree. The decision states, just as the Presidential decision stated, that if NTPC cannot come up with financial backing within one year of the date of the permit, then the Trans Mountain proposal will be substituted. This does not rule out the possibility that the Secretary was "satisfied" that NTPC has the financial capability to complete the project. Indeed, the issuance of the permit itself is *prima facie* evidence of the fact that the Secretary was satisfied. Plaintiffs have not offered contrary evidence.

 Plaintiffs contend that the substance of the decision must be reviewed for abuse of discretion, even assuming that the Secretary was satisfied. Whether or not this contention is correct, I find that the record does not demonstrate that any such abuse occurred.

## I. *Public Hearings on Right-of-Way § 185(k)*

Plaintiff Tribes contend that the Secretary violated § 185(k) in that he did not hold appropriate hearings. Section 185(k) provides as follows:

(k) The Secretary or agency head by regulation shall establish procedures, including public hearings where appropriate, to give Federal, State, and local government agencies and the public adequate notice and an opportunity to comment upon right-of-way applications filed after the date of enactment of this subsection.

In response to this section's mandate, the Secretary promulgated the following regulation:

The authorized officer *shall hold public meetings or hearings* on an application for a right of way grant or temporary use permit *if he determines that such hearings are appropriate and sufficient public interest exists* to warrant the time and expense of such meetings or hearings. Notice of any such meetings or hearings shall be published in the *Federal Register* and in local newspapers.

43 CFR § 2882.3(f) (emphasis added).

 Under both the statute and the regulation the Secretary is granted substantial discretion. Furthermore, the House Conference Report indicates that hearings held under NEPA can satisfy the requirement. H.Conf.Rep.93–624, reprinted in (1973) U.S.Code Cong. & Ad.News, at 2527. This is an entirely reasonable construction since the hearings deal with the same subject.

 In light of the fact that many NEPA hearings were held, in light of the fact that PURPA mandated that the permitting process be expedited, and in light of the fact that the statute and the regulation grant the Secretary broad discretion, defendants must prevail on this issue.

## J. *Compensation for Right-of-Way § 185(l)*

Section 185(l) requires the applicant to pay "the fair market rental value of the

right-of-way or permit, as determined by the Secretary." The Secretary determined the value of the right-of-way to be approximately $80,000 per year. NTPC has paid this amount. The Tribes contend this is insufficient because the value of the right-of-way was calculated on the assumption that the right-of-way was 50 feet in width, not the alleged 2 miles in width.

 My prior determination that the right-of-way is indeed only 50 feet in width is dispositive of this issue. Nothing in the record suggests that the Secretary abused his discretion in determining that the fair market rental value of the 50 foot wide right-of-way was $80,000.

### K. State Standards § 185(v)

Plaintiffs' final contention[9] under the Mineral Leasing Act is that the Secretary violated § 185(v) by failing to take into consideration State standards for right-of-way construction.

 This contention must be rejected for two reasons. First, plaintiffs' complaint acknowledges that no such State standards are presently in existence. See The City's Second Amended Complaint, ¶ 6.1–E. Second, stipulation A–4.D(f) provides that the Notice to Proceed shall not be issued until all required State permits have been obtained, including the Energy Facility Site Evaluation Council (EFSEC) permit. Since EFSEC is the body which promulgates and enforces the State standards, this stipulation has the effect of assuring that the standards, if adopted, will be satisfied.

Therefore, I conclude that the Secretary complied with this portion of the Mineral Leasing Act.

Summary judgment must be issued in defendants' favor as to all issues arising under the Mineral Leasing Act, except as to whether the stipulations adequately protect the habitat of the treaty fishery from degradation.

### VI. ALL ISSUES OTHER THAN THOSE ARISING UNDER PURPA, NEPA AND THE MLA

#### A. Endangered Species Act and Marine Mammal Protection Act

1.) Endangered Species Act

Plaintiffs contend that the defendants violated the Endangered Species Act (ESA), 16 U.S.C. § 1531 et seq., in three different manners.

Section 1536(c) requires the government to perform a "biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected" by governmental action. It further provides that "such assessment shall be completed . . . before any contract for construction is entered into and before construction is begun with respect to such action."

Plaintiff Tribes contend that this section was violated in that the biological assessment was not completed before the "contract for construction" was entered into; they contend that the granting of the right-of-way permit was equivalent to entering into a contract of construction.[10]

Defendants acknowledge that the biological assessment was not completed until after the permit was granted; however, they contend that this is irrelevant because the Notice to Proceed with construction has not as yet been issued. Defendants further point out that the right-of-way permit specifically states that no Notice to Proceed will be issued until the Endangered Species Act is fully complied with.

Plaintiffs contend that defendants also violated § 1536(d) which provides in pertinent part:

The Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency ac-

---

9. Originally, plaintiffs also contended that the Secretary violated § 185(w); however, at oral argument all plaintiffs removed this contention.

10. In their memorandum of law, plaintiffs suggest that other contracts for construction may exist; however, no evidence was ever submitted to support this assertion.

tion which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

Essentially, this section requires that no major action be taken until all of the procedures required by the Endangered Species Act are completed. Defendants admit that all of the procedures are not completed. Specifically, the Secretary as yet has not rendered his final opinion, pursuant to § 1536(b). Therefore, the issue is whether, as yet, an irretrievable commitment of resources has been made.

Once again, plaintiffs contend that the granting of the right-of-way permit constitutes such a commitment. Once again, defendants deny this contention and point to the fact that the permit states that no Notice to Proceed will be issued until the ESA is fully complied with.

The case of *Conservation Law Foundation v. Andrus*, 623 F.2d 712 (1st Cir. 1979) offers guidance in resolving these issues. There, environmentalists contended that the sale of offshore oil and gas leases would constitute an "irreversible and irretrievable commitment of resources" under the ESA. The court noted that the stipulations to the notice of sale required several measures for environmental protection, including one that provided for "modification of operations" so that a "significant biological population," if identified, would not be adversely affected. The court also noted that even after the sale of the leases had occurred, the Secretary would have to approve the construction plans before action could be taken. Therefore, the court concluded that no irreversible or irretrievable commitment of resources had been made.

In the present case the Notice to Proceed has not been granted. Moreover, the Notice to Proceed is explicitly contingent upon compliance with the ESA. Therefore, the facts of this case are even more favorable to defendants than those in *Conservation Law Foundation*.

■ Although *Conservation Law Foundation* dealt only with whether an irreversi-ble commitment of resources had been made, its rationale also applies to the other similar issue raised by plaintiffs—whether the biological assessment was completed prior to the entering into of a contract for construction. Even assuming that the issuance of a permit in certain circumstances might constitute the entering into of a contract of construction, which I doubt, it would be stretching things too far to hold that such was the case when, as in the present instance, the permit for all practical purposes is contingent upon compliance with the Endangered Species Act. A contract implies finality. Due to the necessity of obtaining the Notice to Proceed, the permit is not the final authorization.

Plaintiffs' third contention is that various defendants have permitted, and assisted in, the taking of endangered species and that the laying of the pipeline across Puget Sound will result in such taking.

"Taking" has been broadly construed by the Secretary to include "significant environmental modification or degradation" of habitat which actually injures or kills wildlife. 50 C.F.R. § 17.3. Nonetheless, the record before the court simply does not establish that any such activity has occurred or will occur in relation to an endangered species.

Furthermore, I note once again that the Notice to Proceed is contingent upon compliance with the Act. I must assume that the Notice will not be issued if the construction or operation of the pipeline will result in a taking of endangered species. If this is not the case, there will be time enough to complain at that time.

### 2.) *Marine Mammal Protection Act*

■ Plaintiffs allege that the defendants violated the Marine Mammal Protection Act, 16 U.S.C. § 1361 et seq., in that they: 1.) failed to comply with the Endangered Species Act as to marine mammals; 2.) unlawfully permitted and assisted in the "taking of marine mammals in violation of 16 U.S.C. § 1371(a); and, 3.) authorized and assisted in the use of a port, harbor or other

place for purposes of taking other mammals in violation of 16 U.S.C. § 1372(a)(2)(B).

As to the first contention, I have already determined that the record does not support a finding that the defendants violated the Endangered Species Act. As to the second and third contentions, plaintiffs have failed to submit evidence supporting their allegations.

## B. *The Magnuson Amendment*

 No Oilport and The City contend that the Magnuson Amendment to the Marine Mammal Protection Act, 33 U.S.C. § 476, prohibits the pipeline project as presently proposed.

The full text of the amendment is as follows:

(A) Congress finds that:

(1) The navigable waters of Puget Sound and the state of Washington, and the natural resources therein, are a fragile and important national asset;

(2) Puget Sound and the shore area immediately adjacent thereto is threatened by increased domestic and international traffic of tankers carrying crude oil in bulk which increases the possibility of spills; and

(3) It is necessary to restrict such tanker traffic in Puget Sound in order to protect the navigable waters thereof, the natural resources therein, and the shore area immediately adjacent thereto, from environmental harm.

(B) Notwithstanding any other provision of law, on or after October 18, 1977, no officer, employee, or other official of the federal government shall, or shall have authority to issue, renew, grant, or otherwise approve any permit, license, or other authority for constructing, renovating, modifying, or otherwise altering a terminal, dock, or other facility in, on, or immediately adjacent to, or affecting the navigable waters of Puget Sound, or any other navigable waters of the state of Washington east of Port Angeles which will or may result in any increase in the volume of crude oil capable of being handled at any such facility (measured as of October 18, 1977) other than oil to be refined for consumption in the state of Washington.

Plaintiffs make three different arguments as to why the project violates the amendment. First, they argue that the pipeline is a "facility" located in navigable waters east of Port Angeles. Second, they argue that the oil terminal will be located east of Port Angeles. Third, they argue that the oil terminal will affect navigable waters east of Port Angeles.

This is both a major and a difficult issue. After careful consideration, for the reasons elaborated on below, I find that the project is not prohibited by the Magnuson Amendment.

As to plaintiffs' first argument, I find, in light of the text of the amendment and its legislative history, that a construction of the term "facility" to include an oil pipeline would be unreasonable. First, the Congressional findings set out in sub-section A only show a concern with increased tanker traffic. Additionally, the legislative history does not express any concern regarding pipelines. It is true that at the time the amendment was passed the cross Sound pipeline had not been proposed; however, this cannot entirely explain Congress's failure to mention pipelines. Pipelines were certainly a common means of transporting oil at the time and it must be assumed that Congress was aware of this fact.

Second, although the term "facility" in the abstract could possibly include a pipeline, the manner in which it was used in the Amendment shows that Congress did not intend it to have such a meaning. Specifically, the context in which "facility" is used in its second occurrence within sub-section B is significant. There, the Amendment states in part: "any increase in the volume of crude oil capable of being handled *at* any such facility." (Emphasis added.) The use of the word "at" pre-supposes that a facility is capable of being located in one particular spot, such as are terminals, docks and refineries. A pipeline is not capable of being located "at" a particular place.

Based on the above, I conclude that the Amendment does not prohibit a pipeline through Puget Sound.

██ As to plaintiffs' second argument, that the terminal will be located east of Port Angeles, I find that it is not supported by the factual record and is premised on an unwarranted, narrow interpretation of the amendment. First, the evidence submitted does not establish that any portion of the terminal will be east of the eastern-most boundary of the City of Port Angeles. Second, I do not believe that Congress intended to refer to the technical boundaries of the city when it referred to Port Angeles. As will be discussed in more detail subsequently, the legislative history supports a finding that Congress anticipated and approved of an oil terminal being built in Port Angeles harbor. Nothing in the legislative history suggests that if the terminal was built in the Port Angeles harbor, that it must be located entirely within the boundaries of the City. To construe the amendment as requiring as much would be unreasonable.

I reject plaintiffs' third argument, that the permit was issued in violation of the amendment because it is for construction of a terminal affecting navigable waters east of Port Angeles, as unreasonable, particularly in light of the legislative history. Central to plaintiffs' argument is the fact that the Environmental Impact Statement indicates that an oil spill occurring at Port Angeles would under some circumstances move to the east. It is this fact alone upon which plaintiffs rely to support their contention that the permit is for a terminal "affecting . . . navigable waters of the State of Washington east of Port Angeles."

██ I disagree. Simply because there is a potential that a tanker using a terminal might spill oil and a potential that the oil might move to navigable waters east of Port Angeles does not make that terminal a terminal affecting navigable waters east of Port Angeles. First, it is not the terminal which is doing the "affecting." Second, the amendment does not address mere potentialities.

I recognize that this is a narrow construction, but it is entirely consistent with the legislative history of the amendment. As previously mentioned, the legislative history indicates that Congress did not intend for the amendment to prevent the construction of an oil terminal at Port Angeles. Senator Magnuson, in introducing his amendment, stated:

"I and my colleagues from the State have decided to confirm, as a matter of Federal law, that increased tanker traffic in Puget Sound is simply bad policy and should not be allowed. The amendment is also a clear Federal endorsement of the policy now in the Washington State Coastal Zone Management Program that—

The State of Washington, as a matter of overriding policy, positively supports the concept of a single, major crude oil petroleum receiving and transfer facility at or west of Port Angeles.

This policy would preclude any major new facility, or significant enlargement of any existing facility, on navigable waters east of Port Angeles, and in particular on Puget Sound.

The waters of Puget Sound, and the attendant resources, are indeed a major national environmental treasure. Puget Sound ought to be strictly protected; its resources ought not to be threatened. Since tanker accidents are directly related to the amount of tanker traffic, there should not be an expansion of traffic over what now presently exists. One oil company proposal would quadruple the amount of oil moved now through this pristine environment. This is simply intolerable. There are other oil transport options that would serve the national interest just as well as moving it by tanker through Puget Sound.

I do not necessarily favor increased oil traffic at Port Angeles. The State of Washington already bears its fair share of the Nation's refinery capacity. The social costs of oil tanker movements in my State, in my view, simply outweigh

the benefits. And as I said, there are other alternatives."

123 Cong.Rec. 16229 (October 4, 1977)

Although Senator Magnuson did not favor increased oil traffic at Port Angeles, it is clear that he did not intend for the amendment to prohibit the construction of an oil terminal at Port Angeles. If so, he would not have characterized the amendment as an endorsement of the State of Washington policy which "supports the concept of a single, major crude oil petroleum receiving and transfer facility at or west of Port Angeles."[11] Ibid.

Ultimately this project will probably further the goals of the Magnuson Amendment. In comments reproduced above, Senator Magnuson suggests that there are alternatives to the bringing of oil tankers into the interior of Puget Sound. This project is just such an alternative. Due to the Presidentially imposed requirement that the pipeline hook up with the already existing refineries in the Puget Sound area, it will no longer be necessary for oil tankers to enter Puget Sound. This project should have the effect of eliminating all oil tanker traffic east of Port Angeles. Such a result would go even beyond that which the Magnuson Amendment was attempting to accomplish.

The right-of-way permit was not issued in violation of the Magnuson Amendment; summary judgment must be entered accordingly.

## C. Executive Order 11,988

Executive Order (E.O.) No. 11,988, "Floodplain Management," 42 Fed.Reg. 26,951 (1977), as amended by Executive Order No. 12,148, 44 Fed.Reg. 43,239 (1979), requires all federal agencies to consider the impacts of large projects on floodplains. The Tribes contend that the Federal Defendants violated E.O. 11,988 and its implementing regulations. The defendants respond that E.O. 11,988 does not grant a private right of action and that even if it does, the Secre-

tary adequately considered the impact of the floodplains.

■ I find that this issue is properly before the court. Plaintiffs are granted the right to obtain judicial review of agency action by 5 U.S.C. § 702. See, *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1978). However, I also find that on the merits E.O. 11,988 was not violated.

■ First, the guidelines adopted by the Bureau of Land Management to implement E.O. 11,988 are not binding. They are not regulations and, therefore, do not have the force and effect of law. Instead, they merely set out BLM's internal policies and procedures for implementing the Executive Order.

E.O. 11,988 contemplates that the impact of projects on floodplains be evaluated as part of the NEPA process. E.O. 11,988, § 2(a)(1). An examination of the EIS indicates that to the extent that information on floodplains was available, it was considered and evaluated in the EIS. See, Final EIS Vol. I, Chap. 2, pp. 2–53 through 2–71; Final EIS Vol. I, Chap. 3, pp. 3–78 through 3–82. However, defendants acknowledge that specific and detailed information on floodplains in the Puget Sound area was not available. Final EIS, Vol. I, Chap. 2 at pp. 2–54.

Nonetheless, under the special circumstances present in this case, I believe that the Secretary adequately examined and considered the impact of the project on floodplains. The most significant special circumstance applicable to this case was Congress's mandate, pursuant to PURPA, to expedite the permitting process. In order to achieve this goal the Secretary could only consider information already compiled and available; sufficient time did not exist to allow for the Secretary to undertake new studies and research. Secondly, defendants assert, and plaintiffs have not contested, that floodplain impacts will be addressed by

---

11. Materials submitted by plaintiff indicate that this is no longer the policy of the State of Washington; however this fact is irrelevant in

attempting to discern Congress's intent at the time of enacting the amendment.

the Corps of Engineers in their decision as to whether or not to grant permits for the pipeline to cross streams and Puget Sound, and floodplains have been considered in the State of Washington EFSEC proceeding. Finally, stipulation C–6 to the right-of-way permit requires that the pipeline be constructed consistent with proper floodplain management.

### D. Coastal Zone Management Act

■ Plaintiffs No Oilport and The City allege that the right-of-way permit was issued in violation of the Coastal Zone Management Act, 16 U.S.C. § 1451 *et seq.*, (hereafter CZMA) and must be declared void.[12] Specifically, plaintiffs contend that NTPC did not certify either to the State of Washington or the Secretary that its project is consistent with the State of Washington Coastal Zone Management Program, as allegedly required by 16 U.S.C. § 1456. This section provides in part:

> After final approval by the Secretary of a state's management program, any applicant for a required Federal license or permit to conduct an activity affecting land or water uses in a coastal zone of that state shall provide in the application to the licensing or permitting agency a certification that the proposed activity complies with the state's approved program and that such activity will be conducted in a manner consistent with the program. At the same time, the applicant shall furnish to the state or its designated agency a copy of the certification. No license or permit shall be granted by the Federal agency until the state or its designated agency has concurred with the applicant's certification ... unless the Secretary ... finds, after providing a reasonable opportunity for detailed comment from the Federal agency involved and from the state that the activity is consistent with the objectives of this

chapter or is otherwise necessary in the interests of national security.

16 U.S.C. § 1456(c)(3)(A).

It is uncontested that NTPC failed to certify either to the Secretary or to the State of Washington that its project is consistent with the Washington Coastal Zone Management Program. However, 15 C.F.R. § 930.53(b) and (d), which was in effect at the time of the issuance of the permit, but not when NTPC originally applied for the permit, provides that certification to the State is only necessary for permits contained on a list supplied by a State to the Secretary; the State of Washington does not have such a list on file with the Secretary. Therefore, at least theoretically, when it came time for the Secretary to issue the permit, he checked his files to determine whether a consistency certification was required as to this permit and, seeing that this permit had not been listed by the State of Washington as a permit for which a consistency certification would be required, he went ahead and issued the permit without the certification.

■ Regardless of whether the regulation excuses NTPC's failure to certify consistency, I find that if any error was committed it was a harmless error which does not justify voiding the right-of-way permit. All the parties agree that the failure of NTPC to certify consistency with the Washington Coastal Zone Management Program does not preclude the State of Washington from having its say on whether the project is consistent with its program. This determination will be made in the State of Washington EFSEC proceeding. Indeed, if NTPC would have certified consistency with its original application, as allegedly required, the determination by the State of Washington still would have been made in the EFSEC proceeding. The failure of NTPC to certify consistency did not alter the rights of the parties in any respect.

---

12. Additionally, plaintiff No Oilport contends that the President's selection of the NTPC proposal for purposes of PURPA violated the CZMA. This contention is without merit. The CZMA did not apply to the President's decision, because the President did not grant a license or permit.

5 U.S.C. § 706 sets out under what circumstances agency action shall be set aside. It provides in pertinent part that "due account shall be taken of the rule of prejudicial error." I find that no one was prejudiced as the result of any error committed in relation to the CZMA and, therefore, summary judgment must be issued in defendants' favor on this issue.

### E. The Port Preference Clause

■■■ The Port Preference Clause, Art. I, Sec. 9, Cl. 6 of the United States Constitution, provides that:

> No preference shall be given by any regulation of Commerce or Revenue to the Ports of one State over those of another; nor shall vessels bound to or from one state be obliged to enter clear or pay duties in another.

Plaintiff No Oilport alleges that PURPA and the President's selection of NTPC for the purposes of PURPA violate this clause.

While it is true that the President selected a port in Washington and did not select a port in Alaska, this does not necessarily mean that the Port Preference Clause was violated. The few cases decided under the clause indicate that it does not prohibit federal action favoring one port over another, but rather federal action favoring the ports of one State over all the ports of another State. *State of Pennsylvania v. Wheeling and Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855); *Alabama Great Southern R. Co. v. United States*, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951).

Furthermore, it appears likely that plaintiff No Oilport lacks standing to raise this issue.

I find, on the merits, that the Port Preference Clause of the United States Constitution was not violated; summary judgment must be entered accordingly.

### F. Breach of Lease

■■■ Some time ago, the City of Port Angeles leased property on Ediz Hook from the Federal Government. This lease is still in effect. The Secretary allegedly violated this lease by granting NTPC a right-of-way through the leased property. The City does not seek monetary damages for this breach, but rather declaratory and injunctive relief.

In *White v. Administrator of General Services Administration*, 343 F.2d 444 (9th Cir. 1965), the Ninth Circuit Court of Appeals interpreted the Supreme Court case of *Larson v. Domestic and Foreign Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) as holding that the government has not waived its sovereign immunity from suits for injunctive relief based on contract. This case is on point and must be followed.

Therefore, defendants are entitled to summary judgment on this issue.

### G. APA Rulemaking Procedures

Plaintiff Tribes allege that the Secretary and the President violated the rulemaking procedures of the APA by not publishing as rules the procedures to be used in processing applications under PURPA.

As to the argument that the President should have published procedures, the APA offers a definitive answer. Section 552, which is the section which requires rules to be published, specifically states that for its purposes the office of the President is not an "agency." 5 U.S.C. § 552(e).

■■■ The issue as to whether the Secretary should have promulgated rules pursuant to the APA is somewhat closer; however, I also resolve this issue in defendants' favor. First, it must be noted that PURPA contained detailed procedures for the processing of applications. It was merely the Secretary's obligation to "establish a schedule for conducting reviews and making recommendations concerning . . . applications filed under [PURPA]." It is not clear that a "schedule" is something which 5 U.S.C. § 552 requires to be published as a rule. It certainly is not a "substantive rule of general applicability." 5 U.S.C. § 552(a)(1)(D). Additionally, it must be noted that the PURPA process was a one time affair.

■■■ If the schedule should have been published as a rule, I find that the Secre-

tary's failure to so publish the schedule constitutes harmless error. See, *Pitts v. United States*, 599 F.2d 1103 (1st Cir. 1979). At the most the Tribes have demonstrated that they were inconvenienced by the failure to publish the schedule, they have not demonstrated any prejudice resulting therefrom.

### H. Due Process and Appearance of Fairness

Plaintiff No Oilport asserts a vague, general claim to the effect that the doctrine of appearance of fairness, which is rooted in due process considerations, was violated throughout the entire administrative process. Although plaintiff's claim is vague, it appears that primarily plaintiff is objecting to alleged ex parte contacts with the decision-makers by NTPC.

This action is not review of an agency adjudication based on an evidentiary hearing and a record. This action is review of informal agency action not based on a record developed in an evidentiary hearing. I believe that this distinction is significant. The ex parte rules of the APA, 5 U.S.C. § 554, only apply to the former. Additionally, of all the cases cited by plaintiff in support of its contention that the appearance of fairness doctrine has been violated, only one involved informal agency action as opposed to agency adjudication. This is not to say that there are no due process constraints on informal agency action, but only that a more lenient standard than is applicable to agency adjudication must be applied.

I shall not attempt to define the outer limits of this standard, but rather I simply find that plaintiff has not presented evidence tending to suggest that this more lenient standard was violated.

### I. Treaty Rights and Trust Responsibility

Perhaps the most troublesome of all the issues raised in these actions are the Tribes' claims that the Federal Defendants' actions constitute the breach of certain treaty rights and the breach of the trust responsibility owed by the United States to the Tribes. Specifically, as to the treaty rights issue, the Tribes allege:

> Actions of the defendants threaten to and will interfere with the treaty fishing rights of plaintiffs and their members, rights federally adjudicated as guaranteeing plaintiffs a share in anadromous fish runs.

As to the trust responsibility issue, the Tribes allege:

> The Federal Defendants have breached this duty of care, and threaten to do so further, by failing to adequately evaluate and disclose risks imposed upon Indian people in the federal decision-making process, and by failing, in the course of performing duties imposed by PURPA, NEPA and MLA to use the highest degree of care to ensure that Indian interests are fully protected.

### 1.) Treaty Rights

Plaintiff Tribes hold a treaty right to "take fish at usual and accustomed grounds and stations ... in common with all citizens of the territory." Treaty of Medicine Creek, 10 Stat. 1132 (1855); Treaty of Point Elliot, 12 Stat. 927 (1859); Treaty of Point No Point, 12 Stat. 933 (1859). This treaty right has been construed to consist of a number of rights. It guarantees the Tribes physical access to their "usual and accustomed" fishing grounds. *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); *Confederated Tribes of Umatilla Indian Reservation v. Alexander*, 440 F.Supp. 553 (D.Or.1977). It guarantees the Tribes up to 50 percent of the harvestable anadromous fish runs which pass through their usual and accustomed fishing grounds, as needed to provide the Tribes with a moderate standard of living. *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Additionally, as a result of this second right, a duty is imposed upon the United States "to refrain from degrading the fish habitat to an extent that would deprive the tribes of their moderate living

needs." *United States of America et al. v. State of Washington et al.*, 506 F.Supp. 187 (W.D.Wash.1980). It is this duty which the Tribes contend was breached by the President in selecting the NTPC proposal and by the Secretary in issuing the right-of-way permit.

The Tribes contend that this duty has been breached in that the pipeline has the potential to leak or rupture as it crosses Puget Sound and the various rivers in which anadromous fish run, and in that the project will increase the level of oil tanker traffic in the Straight of Juan de Fuca, thereby increasing the potential of oil spills. It is uncontested that if a large enough oil leak or spill did occur, it could significantly degrade the fish habitat. Additionally, they contend that the duty has been breached in that the construction of the pipeline across the various rivers in which the anadromous fish run will cause increased sedimentation which will degrade the fish habitat by destroying spawning grounds.

In *United States v. Washington*, supra, Judge Orrick not only recognized the duty imposed upon the United States by the treaties "to refrain from degrading the fish habitat to an extent that would deprive the tribes of their moderate living needs," at p. 208, but also established certain burden of proof rules to help orderly adjudicate a tribe's contention that a certain governmental action will breach the duty. Judge Orrick stated that:

> the plaintiffs must shoulder the initial burden of proving that the challenged action(s) will proximately cause the fish habitat to be degraded such that the rearing or production potential of the fish will be impaired or the size or quality of the run will be diminished.

At p. 208.

Once this initial burden is satisfied, then the burden switches to the Government. The Government must:

demonstrate that any environmental degradation of the fish habitat proximately caused by the State's [in this case the United States'] actions (including the authorization of third parties activities) will not impair the tribe's ability to satisfy their moderate living needs.

At p. 208.

Therefore, if a genuine issue of fact exists as to whether construction of the NTPC project "will proximately cause the fish habitat to be degraded such that the rearing or production potential of the fish will be impaired or the size or quality of the run will be diminished," then defendants cannot prevail on this portion of their motion for summary judgment. Instead, an evidentiary hearing must be held at which the Tribes are permitted to meet their burden set out above.

■■ I find that such an issue of fact exists. The affidavit of Mr. Charles Edward Kay, certain statements contained within the EIS and to a lesser extent the affidavit of Mr. David Somers raise an issue of fact as to whether sedimentation caused by burying the pipeline across rivers will adversely affect spawning beds such that the rearing or production potential of the fish will be impaired or the size or quality of the run will be diminished.[13] In the section on unavoidable adverse impacts in the EIS it is stated:

> *Sedimentation of spawning areas would reduce salmon and trout populations.* These areas are described in chapter 3. *Several spawning cycles would be required for reduced populations to recover to preproject levels.* The initial population reductions would probably not be noticed in ocean fisheries; however, reductions might be noticed in river fisheries in severe cases. In subsequent years during project operation, populations would probably recover to within the nor-

---

**13.** It is possible that other genuine issues of material fact, in addition to the one involving the effect of sedimentation on spawning grounds, may exist in relation to the Tribes' treaty right claim. Since one genuine issue of material fact is sufficient to preclude summary judgment, I do not reach this issue.

mal range of population fluctuations. (Emphasis added.)

Final EIS at 5–6.

Additionally, a close examination of Table 2.1–65 on page 2–76 and Table 3.2–15 on page 3–84 reveals that sedimentation will affect spawning grounds in the Dungeness River in which the Lower Elwha Klallam Band has fishing rights and will affect spawning grounds in the North Fork of the Stillaguamish River in which the Tulalip Indians have fishing rights. Moreover, the EIS reports at page 3–85 that although "it is unlikely that any reduction [in fish] would be noticed in . . . Indian fisheries . . . if impacts are substantial, reductions might be detected in certain . . . Indian fisheries . . . "

These statements, along with the before-mentioned affidavits, are certainly not dispositive; however, they are sufficient to raise a genuine issue of fact as to whether construction of the NTPC project will proximately cause the fish habitat to be degraded such that the rearing or production potential of the fish will be impaired or the size or quality of the run ˋdiminished. Therefore, defendants' motion for summary judgment must be denied as it relates to the treaty rights issue. The Tribes must be allowed the opportunity to attempt to satisfy their burden.

*2.) Trust Responsibility*

A generalized trust responsibility does not exist in the abstract, but rather only arises from a statute, treaty or executive order. *North Slope Borough, et al. v. Andrus, et al.*, 486 F.Supp. 326 (D.D.C.1979), reversed on other grounds, 642 F.2d 589 (D.C.Cir.1980); see, *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). Here, unquestionably, the treaties involved place substantial duties upon the United States. Because, as previously discussed, there exists an issue of fact as to whether at least one of those duties has been breached, it is not possible at this time to determine whether the trust responsibility which arises as a result of the treaties has been fulfilled.

## VII. CONCLUSION

These cases present many difficult, close issues. As is apparent from the above discussion, I resolve the vast majority, although not all, of the issues in defendants' favor. Any project the magnitude of the NTPC proposal carries with it the potential of causing environmental damage and social change. This alone is not determinative. As a result of complying with the many statutes discussed throughout this opinion, this potential has been minimized. It now only remains to determine whether the Indians' treaty rights have been breached.

The defendants' motions for summary judgment are allowed as to all issues, other than the treaty rights issue and the closely related issues concerning breach of trust responsibility and whether the stipulations imposed under the Mineral Leasing Act are adequate to protect the treaty fishery. As to these issues, genuine issues of material fact exist. Plaintiffs' motions for partial summary judgment are denied.[14]

---

14. The Tribes' motion for a continuance is denied. This court is under a congressional mandate to expedite these actions. 43 U.S.C. § 2011. The Tribes filed their action over nine months ago; they cannot reasonably complain of a lack of time.